USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED:  06/08/2022

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WATERLOO CAPITAL PARTNERS, LLC,

                 Plaintiff,

           v.

BWX LIMITED,

                 Defendant.

No. 18-CV-6542 (RA)

OPINION AND ORDER

---

RONNIE ABRAMS, United States District Judge:

      Plaintiff Waterloo Capital Partners, LLC ("Waterloo"), sued BWX Limited ("BWX") in this action, asserting a host of claims arising from the parties' previous business dealings. After summary judgment and a joint stipulation of partial dismissal, only one of Waterloo's claims proceeded to trial: its claim that BWX breached a contract between the parties by failing to pay a fee that, under the contract, was due to Waterloo if the aggregate enterprise value of certain companies that BWX acquired with Waterloo's assistance exceeded $130 million. The Court held a bench trial on that claim and now enters judgment for BWX.

## BACKGROUND[1]

### I.    Overview and Procedural History

      Waterloo is a U.S.-based consulting company that provides financial advice to other companies, including advice on executing strategic acquisitions. BWX is an Australian beauty and wellness company that conducts business in New York. In May 2017, Waterloo and BWX entered into a contract by which Waterloo would assist BWX in identifying North American

---

[1] The Court discusses only the facts and procedural history that are relevant to Waterloo's remaining claim.

beauty companies to acquire and in facilitating BWX's valuation and acquisition of such companies.  The contract provided that if BWX successfully acquired a company that Waterloo had identified, Waterloo was entitled to a "success fee," the amount of which depended on the "enterprise value" of the acquired company.  According to Waterloo, BWX has failed to pay Waterloo the full success fee that Waterloo is due under the contract.  The parties' dispute centers on a disagreement over how to calculate the "enterprise value" of two companies that BWX acquired with Waterloo's assistance—specifically, over whether the full potential amount of earnouts that were featured in both acquisitions should be considered part of the acquired companies' "enterprise value," as that term is used in the contract.  Waterloo says yes; BWX says no.

Waterloo filed the complaint in this action in New York state court in April 2018.  The complaint raised twelve claims against BWX, arising not only from the "enterprise value" dispute but also from other dealings and contracts between the parties.  BWX removed the case to federal court in July 2018, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332.  After Waterloo moved for summary judgment on its two claims that related to the "enterprise value" dispute—breach of contract and account stated—BWX filed a cross-motion for summary judgment on the account stated claim.  In an oral ruling on April 1, 2020, the Court denied Waterloo's motion and granted BWX's motion.  As relevant here, the Court found that the term "enterprise value" was ambiguous and that its meaning could not be definitively settled by the extrinsic evidence that had been presented by the parties at summary judgment.  Following the Court's ruling, the parties jointly stipulated to dismiss all of Waterloo's claims with the exception of the breach of contract claim.

The case proceeded to a bench trial.  On September 30, 2021, the parties filed their joint pretrial order, which disclosed five witnesses, three of whom would present their direct testimony by affidavit.  The parties also submitted to the Court joint deposition designations and a joint list of 40 potential trial exhibits.  BWX objected to one exhibit, a report prepared by a third-party company, on foundation and hearsay grounds.  The parties each filed proposed findings of fact and conclusions of law; no pretrial motions were filed.  The Court held a final pretrial conference on October 25, 2021, at which it reserved ruling on BWX's exhibit objection until the exhibit was introduced at trial.

The bench trial commenced on November 1, 2021.[2]  Plaintiff began its case with the direct testimony of Miguel Fabregas—Waterloo's founder, principal, and sole member—who signed the May 2017 contract on Waterloo's behalf.  Fabregas' testimony was followed by that of Alan Finnis, an auditor with a third-party company, who had reviewed certain financial reports issued by BWX that discuss the financial and accounting significance of the acquisitions at issue here.  In accordance with this Court's individual rules, Finnis' direct testimony was admitted via affidavit; his cross-examination and redirect testimony were elicited through live (albeit remote) testimony.

Trial resumed on November 2 with the testimony of Aaron Finlay, BWX's former Finance Director, who had signed the May 2017 contract on behalf of BWX.  Finlay's direct testimony was also admitted by affidavit, and his cross-examination and redirect testimony were also elicited remotely through videoconference.  The next witness to appear was Efee Peell, BWX's current Chief Financial Officer, who also testified through videoconference.  Trial concluded on November 3 with the remote testimony of David Fenlon, BWX's current Managing Director and

---

[2] At the beginning of trial, the Court admitted the witness affidavits, deposition designations, and Joint Exhibits 1 through 23 and 25 through 40.  *See* Trial Tr. at 13:12-24.

CEO.  After hearing argument on the issue, the Court overruled BWX's objection to Exhibit 24, the third-party report, and admitted it into evidence.  *See* Trial Tr. at 225:14-228:7.

Following trial, the parties submitted updated proposed findings of fact and conclusions of law, as well as objections to each other's proposed findings and conclusions.  On January 27, 2022, the Court held a telephone conference at which it directed the parties to file supplemental letters discussing (1) whether post-trial expert evidence regarding the meaning of "enterprise value" or any other disputed terms was necessary; and (2) the reconciliation of apparent discrepancies in the parties' documentary evidence regarding the purchase prices of the acquired companies.  The parties submitted those letters on March 11, 2022.  As relevant here, Waterloo argued that "additional expert testimony"—in other words, any expert testimony, given that neither party introduced any expert—"is unnecessary to resolve the case in its favor"; BWX similarly stated that it did "not see a reason or legal justification to reopen the trial record to hear expert testimony" and asserted that Waterloo's decision not to call an expert demonstrated that it had failed to carry its burden of proof at trial.

## II.    Evidence Elicited at Trial

### A.    The Contract Between Waterloo and BWX

Miguel Fabregas is the principal manager of Waterloo Capital Partners, LLC, which provides advisory services to corporate and family offices.  Trial Tr. at 14:18-25.  While working for Waterloo's first client, a Canadian company named George Weston Limited, Fabregas realized that there were significant opportunities in the North American natural beauty market.  *Id.* at 17:7-20.  Through personal research and meeting with various beauty companies, he acquired "an incredible amount of knowledge" about that market, including knowledge about individual North American companies in the market.  *Id.* at 17:20-18:19.

During his work for George Weston, Fabregas met John Humble, who was at the time the CEO of BWX, an Australian beauty and wellness business.  *Id.* at 21:11-23.  When they first met, Fabregas "got the sense" that Humble "was pitching BWX" as a company in whose stock George Weston should invest.  *See id.* at 21:17-21.  Several months after that initial meeting, Humble asked Fabregas to meet with him and with BWX's then-Finance Director, Aaron Finlay, in New York.  *Id.* at 22:10-17.  During this meeting, Fabregas again had the impression that Humble and Finlay "were trying to draw up support for [BWX] stock" and were "visiting with investors" for that purpose.  *Id.* at 22:5-9.  Fabregas believed that while BWX's "brand in Australia seemed fairly good," BWX carried risk by having only one beauty brand.  *Id.* at 22:20-23:12.  He told Humble and Finlay that they needed to "derisk" this aspect of their business.  *See id.* at 23:13.

After this meeting and following subsequent email communications, BWX and Waterloo eventually agreed to enter into a contract by which Waterloo would act as BWX's "exclusive financial representative in North America" with respect to BWX's acquisition of North American beauty companies that had been initially introduced to BWX by Waterloo.  *See id.* at 25:3-22; Joint Ex. 2 at 1.  Fabregas drafted a written contract memorializing this agreement, borrowing from an investment bank's template for a similar type of contract.  *See* Trial Tr. at 28:9-11.  On April 7, 2017, the first contract between the parties was executed by Fabregas on behalf of Waterloo and by Humble on behalf of BWX.  *See* Joint Ex. 2.[3]  The contract stated that Waterloo's role as BWX's financial representative included identifying, assessing, and liaising with companies that might be acquired by BWX; assessing their operational, economic, and financial performance; "identify[ing] different transaction structures"; and assisting BWX in valuating these companies in order to recommend a target company and "its equity value range."  Joint Ex. 2 at 1-2; Trial Tr.

---

[3] Emails between the parties appear to indicate that Finlay had reviewed the April contract or an early draft of it and had offered comments, *see* Joint Ex. 1 at 1, but Finlay's signature does not appear on the April contract.

at 26:16-19 (describing "an agreement by which [Fabregas] would introduce [BWX] to companies" and "help [BWX] value them" and "acquire them"). The agreement also provided that Waterloo would assist with various aspects of closing any such transaction. Joint Ex. 2 at 2-3.

In exchange for these services, Waterloo was to be paid a retainer fee of $20,000 a month. Trial Tr. at 26:21-22, 28:21-23; Joint Ex. 2 at 3. In addition to this fee, Waterloo was entitled to a "success fee" if BWX were to successfully acquire at least 67% of the "issued and outstanding economic and voting equity of" a company that Waterloo had identified for BWX's potential acquisition (hereinafter referred to as a "success fee company"). Joint Ex. 2 at 3. The amount of Waterloo's "success fee" for an acquired company was governed by the "enterprise value" of the acquired company: if the company's enterprise value was between $0 and $69 million, Waterloo was entitled to a $2 million success fee; if the company's enterprise value was between $69 million and $99 million, Waterloo was entitled to a $2.25 million success fee; and if the company's enterprise value was greater than $99 million, Waterloo was entitled to a $2.5 million success fee. *See id.*

The contract provided that "[f]or the purposes of this agreement, 'enterprise value' shall mean the equity value acquired by BWX in the success fee company divided by BWX's resulting percentage ownership plus net financial debt of the success fee company." Joint Ex. 2 at 4.[4] Neither the term "equity value" nor the term "net financial debt" was defined in the contract. Nor, according to Fabregas, did the parties ever discuss with each other that definition or their intended

---

[4] Quotations from exhibits, affidavits, and other documents decapitalize certain terms for readability.

meanings of "enterprise value." Trial Tr. at 32:15-17. Under the terms of the April contract, there was no cap to the amount of money Waterloo could potentially earn through multiple success fees.[5]

On May 17, 2017, the parties executed a new contract that superseded the April contract; this contract was again signed by Fabregas on behalf of Waterloo, but was signed by Finlay, not Humble, on behalf of BWX. Trial Tr. at 38:4-8; Joint Ex. 6; *see also* Joint Ex. 5 (emails circulating executed signature pages). It is this second contract that governs the current dispute between the parties. The May contract is nearly identical to the April contract, but contains a few material changes. First, Waterloo was now entitled to a success fee if BWX acquired "control" of a success fee company—that is, acquired over 50% of the issued and outstanding economic and voting equity of a success fee company—as opposed to acquiring 67% of a success fee company. Joint Ex. 6 at 4. Second, the May contract provided that if more than one success fee company was acquired within the same twelve-month period, the enterprise values of each company "shall be aggregated" "for purposes of determining the aggregate success fee payable to" Waterloo. *Id.* Third, the May contract stated that Waterloo might be entitled to an "additional success fee" on top of its baseline "success fee" if BWX acquired more than one success fee company in the same 12-month period: specifically, if the "aggregated" enterprise value of the acquired success fee companies was "greater than US$130 [million], then one percent (1%) of such aggregated" enterprise value would be "added to the [baseline] success fee." *Id.* at 3. The May contract capped Waterloo's maximum success fee at $4 million. *Id.*

These revisions were the result of email negotiations between Waterloo and BWX during the preparation of the May contract. In a May 11 email to Finlay, Fabregas stated that the parties

---

[5] Fabregas testified that BWX told him that the company was open to spending up to $200 million in acquisitions. Trial Tr. at 25:23-26:1. *But see* Joint Ex. 1 at 6 (email from Humble to Fabregas stating: "As discussed our comfort zone is around the USD 50m – 150m but could be extended at the upper end to accommodate the right deal.").

"need[ed] to amend [the April] agreement" to change the "control definition that was inserted [into the April contract] at the last minute," which determined when BWX was understood to have acquired "control" of a company.  Joint Ex. 4 at 2.  At trial, Fabregas explained that he had felt that the 67% control definition in the April contract was not added "in good faith" because it had meant that BWX would owe Waterloo no success fee even if it acquired a majority of a company and thereby effectively controlled it.  *See* Trial Tr. at 30:2-14.  In response to Fabregas' email, Finlay agreed to change the control definition in exchange for revising the success fee formula. *See* Joint Ex. 4 at 1.  Finlay's original suggestion was that the 1% additional success fee be triggered when the aggregate enterprise value of multiple success fee companies exceeded $150 million, and that the success fee cap be $5 million.  *Id.*  Fabregas' counter-proposal, which he emailed to Finlay and Humble, was to lower the fee cap to $4 million in exchange for lowering the 1% additional success fee threshold to $130 million.  *Id.*  As he wrote in his email and as he testified at trial, Fabregas suggested this specific threshold amount because he believed that the aggregate enterprise values of the two companies BWX was considering acquiring at the time (and did in fact acquire) would be between $130 million and $140 million.  *Id.* (Fabregas explaining that "if we could lower the threshold to $130m for the additional success fee, then I think our interests would be aligned"); Trial Tr. at 35:12-36:15.  Fabregas testified that he offered BWX this "better deal" in the interests of building a long-term relationship with BWX.  Trial Tr. at 36:22-37:2.

The May contract provided the same definition of "enterprise value" as did the April contract: "For purposes of this agreement 'enterprise value' shall mean the equity value acquired by BWX in the success fee company divided by BWX's resulting percentage ownership plus net financial debt of the success fee company."  Joint Ex. 6 at 4.  Again, the parties did not discuss the

meaning of "enterprise value," "equity value," or "net financial debt" in advance of signing the May contract.  Trial Tr. at 40:5-8 (Fabregas testifying that there was no discussion with BWX about the meaning of "enterprise value" in advance of the May contract being signed); Finlay Aff. ¶ 16 ("I recall no discussion of any kind, let alone negotiation, over the meaning or scope of the term 'enterprise value' or any other component of the stated formula at the time we entered into the contract.").

### B.    BWX's Acquisition of Mineral Fusion and Andalou Naturals

BWX completed two transactions subject to the May contract by acquiring two North American beauty companies that had been initially identified by Waterloo: Mineral Fusion and Andalou Naturals.  Trial Tr. at 42:18-22.[6]  First, on June 30, 2017, BWX acquired 100% of the equity in Mineral Fusion.  Trial Tr. at 43:23-44:6; Joint Ex. 9 (Mineral Fusion purchase agreement). The executed purchase agreement for Mineral Fusion provided that the "aggregate purchase price for the Transferred IP[7] and the Transferred Equity payable under this Agreement is $42,200,000." Joint Ex. 9 at 1.  Of that sum, $145,000 constituted the purchase price for the "transferred IP" and $42,055,000 constituted the purchase price for the "transferred equity," the latter of which was defined as the "equity purchase price."  *Id.* at 1-2.  The agreement then provided that another figure, defined as the "estimated equity purchase price," would be the equivalent of the $42,055,000 figure, plus estimated closing cash and working capital overage, minus working capital underage, estimated closing indebtedness, and transaction expenses.  *Id.* at 2.

The Mineral Fusion purchase agreement further provided, in a section entitled "Earn-out Payments," that the selling shareholders could potentially receive "additional consideration for the

---

[6] There is no dispute that Mineral Fusion and Andalou Naturals are "success fee companies" as that term is defined in the May contract.

[7] "IP" is undefined in the agreement and remained undefined at trial but presumably means "intellectual property."

transferred equity" of up to $4.6 million—but that this additional consideration would be paid only

if Mineral Fusion's gross profits reached certain specified milestones within a specific time period

following closing.  *Id.* at 9-10.  It is undisputed that those milestones were not reached, meaning

that none of the $4.6 million was ever paid by BWX to Mineral Fusion's selling shareholders.  *See*

Trial Tr. at 70:24-71:2.

Second, in October 2017, BWX acquired 100% of the equity in Andalou Naturals.  Trial

Tr. at 50:10-17; Joint Ex. 12 (Andalou Naturals purchase agreement).  The executed purchase

agreement stated that the "aggregate purchase price . . . shall be Eighty Million Dollars."  Joint Ex.

12 at 16.  In a separate contract that BWX signed with two of Andalou Naturals' selling

shareholders—Mark and Stacy Egide—BWX also promised to pay the Egides up to $11.2 million

in additional "compensation" if Andalou Naturals met specified annual profit milestones in the

years following closing.  Joint Ex. 27 (contract entitled "Andalou Naturals Egide Compensation

Plan and Agreement") at 2-3; Finlay Aff. ¶ 24.  BWX characterizes this arrangement as "an

incentive to retain [the Egides] in management, and to keep them actively promoting the Andalou

brand and engaged in its success."  Finlay Aff. ¶ 24; BWX's Post-Trial Proposed Findings of Fact

and Conclusions of Law ("BWX F&C") ¶ 31.  However, the compensation plan did not appear to

condition these payments on the Egides' role with Andalou Naturals or on any other actions by the

Egides—only on Andalou Natural's profits.  *See* Joint Ex. 27 at 2-3; Trial Tr. at 245:5-246:17

(Fenlon's testimony).

According to Efee Peell, who became BWX's Chief Financial Officer in 2020, BWX paid

the Egides a total of $5.7 million in the years following BWX's acquisition of Andalou Naturals.

Trial Tr. at 209:5-210:13.  Some of Peell's testimony appeared to indicate that of that $5.7 million,

only about $4.9 million was paid because the profit milestones described in the compensation plan

were triggered, and that the remaining $800,000 was "a settlement amount" that was paid to the Egides in connection with prematurely terminating the compensation plan.  Indeed, Peell testified that the profit milestones had *not* been met the year that the $800,000 payment was made.  *Id.* at 210:19-211:12.  Further, BWX's post-trial submission describes this $800,000 as a "termination and release payment," rather than an earnout.  BWX F&C ¶ 37 ("In May 2020, the Egides asked to wind up all of their contractual obligations and other ties to Andalou, including by terminating the Compensation Plan.  The parties entered into arms-length negotiation of the terms of their exit, which, among other things, resulted in a Termination and Release payment of $400,000 to each of Mark and Stacey under the Compensation Plan.").  Both parties appear to agree, however, that the $800,000 did qualify as an earnout payment such that BWX paid a total of $5.7 million in earnouts with respect to the Andalou Naturals acquisition.  In 2020, the compensation plan with the Egides was extinguished.  Trial Tr. at 211:17-20; Joint Ex. 34 at 45.

### C.    The Dispute Over the Additional Success Fee

After Mineral Fusion and Andalou Naturals were acquired, Waterloo sent BWX its invoices in connection with those transactions.  The first success fee was for Mineral Fusion's acquisition; the parties agreed that Waterloo's success fee for this transaction was $2 million.  *See* Trial Tr. 45:19-24; Joint Ex. 11.  Waterloo allowed BWX to pay this fee in installments, given BWX's imminent acquisition of Andalou Naturals, which would increase Waterloo's total success fee.  Joint Ex. 8; Trial Tr. 46:3-47:15; *see* Joint Ex. 11.  After the Andalou Naturals transaction closed, Waterloo sent an updated invoice reflecting this second acquisition.  The updated invoice, dated October 31, 2017, stated that Mineral Fusion's enterprise value was $42.2 million and that Andalou Naturals' enterprise value was $80 million, adding up to an aggregate enterprise value of $122.2 million; Waterloo accordingly billed a total success fee of $2.5 million (minus the portion

of that fee that BWX had already paid pursuant to the installment agreement).  Joint Ex. 14 at 2.  Because the sum of the companies' enterprise values as listed in this invoice did not exceed $130 million, the invoice did not charge a 1% additional success fee.  *See id.*  The parties agreed that BWX would pay this $2.5 million success fee in installments, and Waterloo's first installment invoice dated November 20, 2017 repeats these enterprise value figures.  Joint Ex. 16.  It is undisputed that BWX has paid the $2.5 million baseline success fee in full.

At trial, Fabregas testified that these invoices from late 2017 did not "include the acquisition date fair value of the earnouts" that had featured in in both acquisitions because he "didn't know them."  Trial Tr. at 57:23-58:3.  Fabregas elaborated on this answer with respect to Andalou Naturals' earnouts.  He explained that when he had asked Finlay about the Andalou Naturals acquisition, Finlay told him that BWX was paying $10 million in addition to the purchase price as "compensation for the management" of Andalou Naturals.  *Id.* at 51:9-18.  Accordingly, Fabregas asserted, he believed that this $10 million did not "count[]" as part of the enterprise value of that company.  *Id.* at 58:13-16.  During this same discussion, Fabregas also explained that he "didn't think it made sense to start getting into these details" because he thought that they "were going to blow through this [success fee] number anyway" due to an impending third acquisition (which never materialized).  *Id.* at 59:2-6.  Finally, he stated his belief that because the two acquisitions "had been so successful for" BWX, BWX would "act properly" and not "mislead" Fabregas about the total fee he was owed under the contract.  *Id.* at 59:7-10.

Although Aaron Finlay did not recall whether he had told Fabregas that the contingent payments in connection with the Andalou Naturals acquisition were management compensation, he agreed that this was his position at the time and that it was therefore possible that he had made such a statement to Fabregas.  *Id.* at 190:20-191:4.  However, BWX's October 19, 2017 press

release announcing its acquisition of Andalou Naturals explicitly stated that "BWX . . . has entered into an agreement to acquire Andalou Naturals . . . for initial consideration of US$80m, plus potential additional amounts *subject to Andalou Naturals achieving particular financial milestones*."  Joint Ex. 13 at 1.  The document further stated that these additional amounts were "payable up to US$11.2 m[illion]," not $10 million as Finlay had apparently told Fabregas.  *Id.* at 3.  Fabregas testified that he "did not get" this press release and that he instead relied on Finlay's representation as to both the character and amount of the additional compensation.  Trial Tr. at 97:22-98:11.

Notwithstanding Fabregas' initial explanation that he lacked knowledge of the earnouts, he admitted during cross-examination that when he sent his invoice for the Mineral Fusion transaction that listed Mineral Fusion's enterprise value at $42.2 million, he knew about the earnouts in the Mineral Fusion transaction.  Trial Tr. at 95:22-96:1; *see id.* at 92:1-4 ("Q. Now, you knew that there were earnouts involved in the Mineral Fusion transaction before it closed, did you not?  A. Yes, but things got, as I said, quite complicated towards the end."); *id.* at 96:10-14 ("Q. [O]n October 31, you knew that there was an earnout provision of some kind in the Mineral Fusion transaction?  A. I did.").  These admissions are corroborated by an email thread in which a draft of the Mineral Fusion purchase agreement was forwarded to Fabregas, and in which revisions to the agreements' earnout provisions were specifically discussed.  Joint Ex. 7.  When pressed on this point, Fabregas testified that he became "really confused" when BWX's press release announcing the Mineral Fusion acquisition listed a different number from the purchase price listed in the purchase agreement, and that he ultimately "took the numbers from the press release" for his invoice.  Trial Tr. at 96:5-9.  The press release, however, never mentions a $42.2 million figure.  Joint Ex. 10.  Indeed, the only document in which a $42.2 million figure appears is the sentence in

the Mineral Fusion purchase agreement that states that the "aggregate purchase price for the Transferred IP and the Transferred Equity payable under this Agreement is $42,200,000." Joint Ex. 9 at 1.

Fabregas testified that he "c[a]me to the view that [his] invoices understated the amount BWX owed Waterloo" only "after [BWX's] financial statements came out in late February." Trial Tr. at 61:3-6. Specifically, he explained that one of BWX's financial reports had recognized the Mineral Fusion earnouts and had valued them at "a hundred percent of their face value"—that is, at their full potential amount. *Id.* at 64:16-17, 66:10-12. Fabregas also observed that in another report BWX had characterized the Andalou Naturals earnouts as consideration transferred, not as management compensation; had valued those earnouts at their full potential amount; and had listed this full potential amount as $11.2 million rather than $10 million. *Id.* at 51:19-52:5, 67:24-70:9.

Sometime around his review of these financial reports, Fabregas began communicating with BWX about the alleged undervaluing of the success fees. First, during a meeting with Finlay in New York, Fabregas told Finlay that the enterprise values "might be higher than what [Fabregas had] originally thought." *Id.* at 61:18-22. Finlay apparently responded that Fabregas should send him an email about the issue and he would then "get it sorted out" with Humble. *Id.* at 61:22-24. Fabregas accordingly wrote an email to Finlay on February 10,[8] in which he stated that "if the earnouts are earned and included" for both the Mineral Fusion and the Andalou Naturals transactions, "the total [enterprise value] acquired could be $42.2m + $1.1m and $80.0m + $10.0m = 43.7m + 90m = $133.7m." Joint Ex. 18. In this email, Fabregas appeared to express a belief

---

[8] The order of events is somewhat unclear with respect to Fabregas' realization that the companies' enterprise values might be higher. Although Fabregas testified that it was in "late February" that he "c[a]me to the view that [his] invoices understated the amount BWX owed Waterloo," Trial Tr. at 61:3-6, and that he did not review at least one of the relevant financial reports until after February 21, *id.* at 67:10-13, Fabregas' initial email to BWX raising this issue was dated February 10.

that the earnout payments would comprise part of the enterprise value only if they were "earned." *Id.* At trial, Fabregas explained that in the interests of maintaining his relationship with BWX, he "tried to write [the February 10] email with the softest wording possible." Trial Tr. at 102:11-19. He also appeared to admit that the position he had expressed in that email—that the earnouts would count as part of enterprise value *only if* they were earned—"was a mistake." *Id.* at 103:20-25.

No resolution was reached following the February 10 email. In a March 20, 2018 letter to Finlay that raised the issue again, Fabregas explicitly cited BWX's financial reports, which purportedly showed that "the aggregate enterprise value of . . . Mineral Fusion and Andalou[] is US$ 139.597 million," a sum that "trigger[ed] an additional 1.0% success fee payment." Joint Ex. 19 at 1, 3. Fabregas stated his belief that "in agreement with [BWX's] own reports . . . future considerations or deferred considerations are financial instruments to be booked as financial debt and included in [enterprise value]." *Id.* at 2. Fabregas' cover email transmitting this letter repeated this interpretation: he expressed the opinion that in BWX's financial reports, the "Earn outs for Mineral Fusion and Andalou [Naturals] are treated as financial debt," and agreed that "the Earn Outs are a form of financial debt." Joint Ex. 20 at 2. Finlay responded on April 4, assuring Fabregas that "the issue [would] be dealt with swiftly once [BWX] has been advised appropriately." *Id.* at 1. BWX never, however, paid the additional success fee Waterloo requested.

### D.    BWX's Financial Reports

At trial, BWX's financial reports—Waterloo's primary evidence supporting its position that the full potential amount of the earnouts should count as part of the enterprise value of the acquired companies, and that the aggregate enterprise value of Mineral Fusion and Andalou Naturals thus exceeds $130 million—were examined in some detail.

BWX first recognized the Mineral Fusion acquisition in its annual financial report for the June 30, 2016–June 30, 2017 period.  That report stated that the consideration transferred for the Mineral Fusion acquisition, exclusive of contingent consideration, was $57,414,000 in Australian dollars, or about $44 million[9] in U.S. dollars.[10]  The report also stated that the "provisional" "fair value" of the "deferred consideration" transferred in connection with the Mineral Fusion acquisition, as recognized on acquisition, was $6.2 million in Australian dollars, or about $4.6 million in U.S. dollars—in other words, that the provisional fair value of the deferred consideration consisted of the entire potential amount of the earnout.  Below is an image from the report:

**Consideration transferred**

The following table summarises the acquisition date fair value of each major class of consideration transferred:

|  | Fair value recognised on acquisition (provisional) $'000 |
| --- | --- |
| Cash consideration paid | 57,414 |
| Deferred consideration[1] | 6,002 |
| **Total consideration** | **63,416** |

[1] Contingent consideration of $6.002 million has been recognised in the relation to the acquisition of the Mineral Fusion business. The deferred consideration is payable in cash and is contingent upon the Mineral Fusion business meeting certain gross margin performance measures during 12-month periods measured to 31 December 2017 and 30 June 2018 which the Group estimates will be met in its entirety at acquisition date.

Joint Ex. 30 at 54.  The report further explains that, as of acquisition date, BWX had "estimate[d]" that the Mineral Fusion performance measures would be satisfied in full—which would result in

---

[9] As was observed by Waterloo's counsel during trial, this is higher than the $42.2 million figure that is listed in the purchase agreement as the "aggregate purchase price."  In its post-trial submission, BWX asserted that this discrepancy is due to the fact that about $3.2 million of the funds that changed hands during acquisition consisted of "transaction costs," including the sellers' legal fees, their investment advisor fees, and other transaction expenditures.  BWX Limited's Rebuttal to Plaintiff's Proposed Findings of Fact and Conclusions of Law ("BWX F&C Rebuttal") at 3.  Although this $3.2 million is part of the total sum that was transferred in connection with the Mineral Fusion acquisition, BWX argues, it does not represent part of the value of Mineral Fusion's equity.  *Id.* ("[T]hird-party legal, accounting, financial advisory or other costs, fees and expenses incurred by the parties in bringing the transaction to a close should not be counted as part of the price paid for the equity.").  In response, Waterloo contends that "BWX cannot just ask the Court to deduct $3 million in expenses when BWX provides no evidence that such amounts were actually paid in expenses and when BWX fails to submit all the relevant evidence."  Waterloo March 11, 2022 letter.  Because the Court holds that Waterloo has not prevailed on its claim on other grounds, it need not resolve this eleventh-hour dispute.

[10] A joint stipulation submitted during trial supplies the currency conversions used in this opinion.

the full earnout amount being paid.  *Id.* at 35 ("At acquisition date, [BWX] assesses whether conditions relating to the contingent consideration on acquisition of the Mineral Fusion business are likely to be satisfied, resulting in payment. . . . As at 30 June 2017, management have performed an assessment and estimate that these performance measures will be satisfied in its entirety."); *see id.* at 54 (footnote to the "consideration transferred" table stating that BWX "estimates" that the performance measures "will be met in [their] entirety at acquisition date").

That said, the report took care to emphasize that this fair value estimate was subject to change based on future events.  Specifically, it explained that during "subsequent reporting periods," BWX would revise this estimate, and that any "impact of the revision of the original estimates" would be "recognized in profit or loss."  *Id.* at 35.  This is precisely what happened in subsequent reporting periods after Mineral Fusion failed to meet the profit milestones that would have entitled its shareholders to earnout payments.  For instance, in its report for the period ending December 31, 2017, BWX explained that "management ha[d] performed an assessment and evaluated that [some of the Mineral Fusion profit] targets . . . have not been satisfied."  Joint Ex. 31 at 11.  "Accordingly, the impact of the revision in estimate" was noted by BWX as changes in profit or loss.  *Id.*; *see also* Joint Ex. 32 at 42 (making the same revision for the period ending June 30, 2018).

BWX's reports treated the Andalou Naturals earnouts the same way.  Its financial report for the period ending December 31, 2017 stated that the "consideration transferred" to Andalou Naturals at acquisition, exclusive of the contingent payments, was $105,507,000 in Australian dollars, or about $82,316,504 in U.S. dollars.  The report further provides that the "provisional"

"fair value" of the contingent consideration, as recognized on acquisition date, was $13,673,000 in Australian dollars, or about $10,480,354 in U.S. dollars.[11]  Below is an image from that report:

**Consideration transferred**
The following table summarises the acquisition date fair value of each major class of consideration transferred:

|  | Fair value recognised on acquisition (provisional) $'000 |
|---|---|
| Cash consideration paid at completion[1] | 85,526 |
| Equity settled consideration at completion (refer to Note 5)[2] | 19,816 |
| Working capital adjustment payable[2] | 165 |
| Deferred payments (refer to Note 4)[2] | 13,673 |
| **Total consideration** | **119,180** |

Joint Ex. 31 at 18.  The report stated that at Andalou Naturals' "acquisition date, [BWX] assesse[d] whether the performance conditions relating to the deferred payments for the Andalou Naturals business [were] likely to be satisfied, resulting in payment." *Id.* at 11.  Based on that assessment, "[the] values provided reflect[ed] the net present value of the amount estimated to be payable in subsequent reporting periods." *Id.*  After the Egide compensation plan was terminated without the full potential earnout amount having been paid, BWX's financial reports reflected this development as an increase in profit.  *See* Trial Tr. at 214:14-18 (BWX's current CFO explaining that terminating the Egide compensation agreement resulted in an increase in BWX's profits "[f]rom a noncash perspective").

BWX's financial reports also included independent reports from the auditing firm William Buck.  As part of its audit, William Buck reviewed BWX's statements regarding the Mineral Fusion and Andalou Naturals acquisitions, including BWX's fair value estimates of the contingent consideration transferred.  William Buck's reports explained that both transactions required BWX

---

[11] This value is lower than the $11.2 million figure that both parties have consistently used when describing the full potential amount of the Andalou Naturals earnouts.  Despite the Court's request at the January 27, 2022 conference that the parties address this apparent discrepancy in their March 11, 2022 letters, neither party meaningfully did so.

"to determine the fair value of deferred consideration [*i.e.*, the earnouts]," a process that "required significant judgments and estimates."  Joint Ex. 30 at 68; Joint Ex. 32 at 69.  William Buck's role was, in part, to "test[] the appropriateness of the deferred consideration and review[] the probability of the performance targets being met."  Joint Ex. 30 at 68 (Mineral Fusion); Joint Ex. 32 at 69 (Mineral Fusion and Andalou Naturals).  According to the testimony of Alan Finnis, a William Buck director who had been on the BWX audit team, William Buck concluded that BWX's valuations—that is, BWX's estimates at acquisition that the fair values of the Mineral Fusion and Andalou Naturals earnouts were 100% of their potential amounts—were "not unreasonable" because "it did look as though there was some likelihood that a payment was going to be needed."  Trial Tr. at 136:11-25, 147:14-17.

At trial, BWX relied on Finnis' affidavit to argue that BWX's provisional fair value estimates of the earnouts in its financial reports, along with the commentary accompanying those estimates, merely reflected compliance with relevant Australian accounting standards and were not intended to express an opinion on the "enterprise value" or "equity value" of either company as those terms are used in the May 2017 contract.  In that affidavit, Finnis explained that William Buck's review of BWX's reports was required to "follow the rules and standards set by the Australian Accounting Standards Board."  Finnis Aff. ¶ 7.  One of those rules "required BWX to recognize, as of the date of acquisition, any contingent consideration that might be paid as part of a business combination transaction," such as earnouts.  *Id.* ¶ 10.  Finnis elaborated that in order to comply with this rule, an acquiring company must do exactly what BWX did in its reports: "classify the acquisition-date fair value of contingent consideration arising in a business combination as part of the 'consideration transferred.'"  *Id.* ¶ 11.  The relevant accounting standard confirms this requirement.  Joint Ex. 40 at 11 ("The consideration the acquirer transfers in

exchange for the acquiree includes any asset or liability resulting from a contingent consideration arrangement . . . .  The acquirer shall recognise the acquisition-date fair value of contingent consideration as part of the consideration transferred in exchange for the acquiree.").  Thus, Finnis explained, "BWX management was required to estimate as of the date of acquisition the expected amount payable to the Mineral Fusion and Andalou vendors as a result of their earn out arrangements and then to recognize liabilities at acquisition date for both deferred and contingent liabilities" in order to comply with accounting standards.  Finnis Aff. ¶ 12.[12]

Finnis also testified that "[a]ssigning 'equity value' or 'enterprise value' to any particular asset of the entity under review is not part of the audit or review process," including the BWX audit and review process; he accordingly emphasized that "[c]ontingent consideration is not intended to be a proxy for, or a calculation of, 'enterprise value.'"  *Id.* ¶¶ 8, 13; *see also id.* ¶ 14 (explaining that the fact that BWX's financial statements had to classify contingent payment obligations as "consideration transferred" "does not mean . . . that either category of deferred payment constitutes consideration transferred on the acquisition date"); Trial Tr. at 126:18-21 (Finnis agreeing that he was "not here to testify about the meaning of enterprise value").

But Finnis also testified that companies following the Australian accounting standards are not "necessarily" required to estimate the fair value of earnouts as "the entire amount of the earnouts," as BWX did here.  Trial Tr. at 130:16-18.  Rather, he explained that estimating the fair value of the earnouts on acquisition date "required judgment" on the part of BWX—a position that is echoed by the William Buck auditors' reports.  *Id.* at 130:18-25.  In other words, according to

---

[12] The accounting standards also require that any changes in the fair value estimate of contingent consideration that are based on failure to meet an earnings target be recognized in profit or loss—precisely as BWX did.  *See* Joint Ex. 40 at 14-15 (dictating that "[c]hanges in the fair value of contingent consideration . . . resulting from events after the acquisition date, such as meeting an earnings target . . . are not measurement period adjustments," and that for contingent consideration that is not classified as equity, such "changes in fair value shall be recognised in profit or loss"); *see also* Trial. Tr. at 140:5-15 (Finnis confirming that BWX's profit or loss statements regarding the earnouts were consistent with the relevant accounting standards).

Finnis, William Buck's role was not to dictate a specific valuation amount, but simply to "test[] the appropriateness of the deferred consideration [*i.e.*, the earnouts] and review[] the probability of the performance targets being met"—in other words, to assess the "reasonableness" of BWX's own "calculation" of the fair value of the earnouts.  *Id.* at 134:17-135:21 (discussing William Buck's written statements in the financial reports).

### E.   The PricewaterhouseCoopers Report

At trial, Waterloo introduced a report prepared in July 2018 by third party firm PricewaterhouseCoopers ("PwC").  BWX had commissioned PwC to prepare a report that valued the intangible assets that BWX had acquired from Mineral Fusion and Andalou Naturals. Although the value of those intangible assets is not relevant to the dispute here, Waterloo contends that certain statements made by PwC in the report are probative of BWX's understanding of Mineral Fusion's and Andalou Naturals' "enterprise value" and "equity value."  Namely, in setting out certain figures that BWX management had provided and that PwC had relied on in its valuation, PwC appeared to state that the "estimated fair value" of Andalou Naturals' "enterprise value" was $92.8 million U.S. dollars and that the "estimated fair value" of the Mineral Fusion "enterprise value" was $48.6 million U.S. dollars—in other words, that the estimated "enterprise value" for these two companies included the full potential amount of their respective earnouts.  Joint Ex. 24 at 77, 90.  Moreover, the PwC report stated that "[e]nterprise value . . . is generally considered to include the value of all forms of equity plus the fair value of interest-bearing debt, net of cash," a definition that is nearly identical to the May 2017 contract's definition of "enterprise value."  *Id.* at 56.  The report further explained that for both Mineral Fusion and Andalou Naturals, "enterprise

value" was equivalent to "equity value," because neither company had interest-bearing debt, *id.* at 13.

BWX attempted to preclude this exhibit at trial, arguing that the report stated that it had acquired its underlying figures from BWX "management" without specifying who had provided those figures, and that Waterloo had not called a PwC witness to further testify to the process through which PwC had derived the numbers cited in the report. Trial Tr. at 153:15-154:4. The Court ruled that the report was admissible, but noted that it would, when considering it, "keep defendant's objections in mind." *Id.* at 228:1-6.

### F. Testimony from the May Contract Signatories About Their Intent Regarding the Meaning of "Enterprise Value"

Finally, both parties elicited testimony about the individual signatories' intent (or lack thereof) as to the meaning of "enterprise value" and "equity value" at the time they signed the May contract. As previously discussed, when that contract was signed, there were no discussions between the parties regarding the meaning of "enterprise value," "equity value," or "net financial debt"; nor were there any discussions about how to treat earnouts when calculating the value attached to any of those terms.

Fabregas testified that at the time he signed the April contract—which contained the same definition of "enterprise value" as did the May contract—he understood "enterprise value" to mean "the purchase price of a company, which is essentially what . . . somebody has paid the selling shareholders, plus the net financial debt of the company being acquired." Trial Tr. at 32:9-12. He asserted that this definition was "standard in finance." *Id.* at 32:14. However, Fabregas also testified that when he signed the April contract, he did not have an understanding of the form in which BWX might structure any transactions. *Id.* at 32:18-21.

Following Fabregas' direct and cross examination, the Court questioned him further about whether he had always understood earnouts to be part of "enterprise value" even if they were never earned, or if he had ever believed that the earnouts were part of "enterprise value" only if they were earned.  In response, Fabregas testified as follows:

> I could see that there may be some gray area, and, as I wanted the relationship [with BWX] to continue, and I thought we were doing more deals, I didn't want to come across as, let's say—I don't know, I'm trying to translate, but, you know, nickel-and-diming.  Then when the—and so I thought—you know, what I was trying to do in that [February 10] email is, I had spoken to Mr. Finlay about it in person and said, hey, you know, this is—the reality of these numbers is that we reached the threshold.  He said, don't worry, write me an email, I'll forward it to John, we'll get it sorted out.
>
> And so I tried to write an email that was not aggressive, that wasn't saying, hey, you know, we've reached this, you owe me a couple of million dollars more, and if you write that type of email, probably it's not going to be very good for the relationship.  So I thought, I'll write this email like this, and even present the possibility of doing additional services for them, because what I really wanted to do was continue doing acquisitions for them in perpetuity, given what had happened until then and, frankly, how expeditious they had been in executing my recommendations.
>
> That's—once I saw what the auditors—first of all, when [BWX] did not give me a response, they were not responding either way, they were just ignoring me, and then their auditors came out and said these things count as purchase price [in the financial reports], and then I went and did more diligence on it, and then I became sure that the—that what my original sort of assumption was, that any seller financing had to be part of the purchase price, but then it was very clear that if the auditors are saying it, and the auditors are saying it because the management is telling them this, and, in fact, they also brought in a third party that reviewed the purchase price and also said that these are the actual numbers, then I said, you know, at the date of the acquisition, these things were what they were.

*Id.* at 122:18-124:2.

Testimony was also elicited from Aaron Finlay, BWX's signatory to the contract.  Finlay affirmed that in his mind, "at the time BWX entered into the May 2017 agreement, the enterprise value of any transaction eligible for a success fee would be calculated using the actual purchase price paid to the selling shareholders at the transaction's closing" (assuming that there was no net financial debt).  Finlay Aff. ¶ 17.  He elaborated that, based on his training and experience, he "did

not understand contingent and future obligations such as 'deferred consideration' or 'deferred payments' to be components of 'net financial debt' or the enterprise value of an acquired company." *Id.* ¶ 18; *see id.* ¶ 26 ("Based on my business experience and professional training, contingent future payments, particularly if not earned or received by a seller, play no part in the calculation of enterprise value.").

During cross-examination, counsel for Waterloo tested Finlay's understanding of "enterprise value," and specifically of "equity value." Finlay agreed with the general proposition that one "can measure the equity value of [a] target company by looking at the value of the consideration the acquirer pays to the shareholders of the target company" at the time of acquisition, responding that one "measure[d] the value of the consideration that is paid at the time to the vendors to acquire the business." Trial Tr. at 165:21-166:2. He also agreed that consideration "could take many different forms." *Id.* at 166:6-8. And he acknowledged that "at acquisition date, a contingent payment in the form of an earnout . . . may have some value," the calculation of which would "depend on expectations, likelihoods, and factors that are outside sometimes [*sic*] one's control." *Id.* at 168:20-169:2. Finlay further appeared to agree with Finnis' statement that Australian accounting standards do not require companies to estimate the fair value of an earnout as the entire potential amount of that earnout. *Id.* at 172:13-23 ("Q. But the accounting standards don't require the company to just record the full amount of an earnout that could be earned at any point in the future, correct? A. As I understand it, that's correct . . . They have to put what they consider fair value at the time in accordance with the accounting standards.").

Finlay asserted repeatedly, however, that BWX's valuations in its financial reports were made solely for accounting purposes and were not relevant to determining the enterprise value or equity value of either acquired company under the May contract with Waterloo. *Id.* at 171:7-17;

*id.* at 173:10-13 ("I think the reason that [valuation] statement is there is because of the accounting standards, and that statement doesn't necessarily relate to the usual conventional accepted principles of how you would value an earnout at that time."); *id.* at 174:14-18 ("[M]y expectation of what the enterprise value represents is one that is more along the . . . conventional and accepted principles of enterprise value, not in accordance with Australian accounting standards and the nuances around the business combinations standard.").  Nor, according to Finlay, were the earnouts in either acquisition properly considered part of the companies' enterprise value: rather, he asserted that, "[e]nterprise value is calculated at the actual point in time, and it's not based on estimates or expectations of what might or might not happen in the future."  *Id.* at 174:24-175:2.  When asked to reconcile this position with his earlier agreement that earnouts could have a value on acquisition date, Finlay stated:

> [T]hey can have value, but they are—at completion date, there is no certainty—there may be an expectation, but it is an amount that has not been paid, and, therefore, I don't consider forms a part of consideration for the purposes of calculating enterprise value under the agreement that we had with Waterloo Capital. And if the intention was that they were to be included or amounts similar to that have no certainty, they would have been separately identified as such.

*Id.* at 175:20-176:3.  Finlay also reiterated his position that the Andalou Naturals earnouts were management compensation rather than consideration transferred for the purchase.  *Id.* at 189:6-13.  *But see id.* at 190:1-4 ("Q. Am I right to rely on William Buck to let me know whether that [earnout amount] was, in fact, management compensation or earnouts?  A. For the purposes of representing in the financial statements, I would agree.").

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The sole remaining issue in this case is whether the aggregate "enterprise value" of Andalou Naturals and Mineral Fusion exceeds $130 million, and whether Waterloo is thus entitled to an additional success fee of 1% of that aggregate enterprise value under the May contract.

Answering this question requires deciding whether the parties intended "enterprise value" to include the full potential amount of the earnouts that were included as part of both acquisitions when they entered the contract. The Court finds the following facts and makes the following conclusions of law, as is required by Federal Rule of Civil Procedure 52.

## I.     Legal Standards

The May 2017 contract contains a valid choice of law clause providing that New York law governs the agreement and any disputes that may arise from it. Joint Ex. 6 at 5. "A federal court sitting in New York must apply New York's choice of law rules when its jurisdiction is based on diversity." *Med. Research Assocs., P.C. v. Medcon Fin. Servs., Inc.*, 253 F. Supp. 2d 643, 647 (S.D.N.Y. 2003) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). "New York law," in turn, "is clear in cases involving a contract with an express choice-of-law provision: Absent fraud or violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.,* 230 F.3d 549, 556 (2d Cir. 2000).[13] Because New York has sufficient contacts with the transaction at issue, New York substantive law applies to Waterloo's claim.

The elements of breach of contract in New York are well established: "a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and . . . defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by [the] defendant; and (4) damages to the plaintiff caused by [the] defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

---

[13] Unless otherwise noted, case quotations omit all internal citations, quotation marks, alterations, and footnotes.

The Court's "role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract." *Turner Network Sales, Inc. v. DISH Network L.L.C.*, 413 F. Supp. 3d 329, 341-42 (S.D.N.Y. 2019) (quoting *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 872 (N.Y. 2004)); *accord SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 125 (2d Cir. 2006) ("The cardinal principle [of interpreting contracts] . . . is that the intentions of the parties should control."); *Brown Bros. Elec. Contrs. v. Beam Const. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977) ("[T]he aim is a practical interpretation of the expressions of the parties to the end that there be a realization of their reasonable expectations.").  Contractual ambiguity exists when "the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010).  "In determining whether the contract is ambiguous, a court looks at the contract as a whole in light of the circumstances present when the contract was entered." *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 33 (2d Cir. 2016).

If the contract is ambiguous, "reference to extrinsic evidence provides guidance to the parties' intent." *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992).  Such extrinsic evidence includes "expressed words and deeds" that may act as "objective manifestations" of intent.  *SR Int'l*, 467 F.3d at 125.  For instance, courts may consider "subsequent conduct of the parties" to define ambiguous terms.  *Capital Dist. Enterprises, LLC v. Windsor Dev. of Albany, Inc.*, 53 A.D.3d 767, 770 (N.Y. App. Div. 2008); *see also Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006) (explaining that, under New York law, the factfinder may consider "extrinsic evidence such as the parties' course of conduct throughout the life of the

contract," including "course of dealing and course of performance").  When a party to a contract conducts itself in a manner that might be probative of its interpretation of the contract "for any considerable length of time before it becomes a subject of controversy," that "practical interpretation of [the] contract" is "entitled to great . . . weight."  *Stone Key Partners LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316, 324-35 (S.D.N.Y. 2018).  By contrast, "a party's uncommunicated subjective intent," no matter how sincerely held, "cannot supply the ultimate meaning of an ambiguous contract."  *SR Int'l*, 467 F.3d at 125.  Finally, "[a] court should not interpret a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'"  *Samba Enters., LLC v. iMesh, Inc.*, No. 06-CV-7660 (DC), 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009) (quoting *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171 (N.Y. App Div. 2003)).

## II.     Waterloo Has Failed to Meet Its Burden of Showing That the Parties Intended "Equity Value," as That Term Is Used in the May Contract, to Include the Full Potential Amount of the Mineral Fusion and Andalou Naturals Earnouts

Testimony and other developments at trial narrowed the core dispute regarding the meaning of "enterprise value."  Namely, Waterloo's counsel clarified Waterloo's position that the earnouts should be considered part of the two companies' "equity value," not part of their "net financial debt."  Trial Tr. at 144:1-9.  This representation, taken along with the parties' agreement that neither acquired company had any net financial debt, resulted in "enterprise value" becoming synonymous with "equity value" for both companies.  The parties also provided strikingly similar definitions of the term "enterprise value" at trial: Fabregas testified that "enterprise value" is "the purchase price of a company, which is essentially what . . . somebody has paid the selling shareholders," minus any financial debt, Trial Tr. at 32:9-11, and Finlay affirmed that "at the time BWX entered into the May 2017 agreement, the enterprise value of any transaction eligible for a

success fee would be calculated using the actual purchase price paid to the selling shareholders at the transaction's closing," Finlay Aff. ¶ 17.

But, of course, Waterloo and BWX attach very different numbers to the term "purchase price," with Waterloo contending that purchase price includes the full potential amount of earnouts and with BWX contending that purchase price includes only the price that was actually paid on the date of acquisition in exchange for a company's equity.[14]  Given the evidence before it, the Court is not in a position to reject either of these interpretations as commercially unreasonable.[15] Nor, however, have the parties pointed to any settled definition of "enterprise value" or "equity value" under New York law—at least, no settled definition that accounts for the role of earnouts in setting a value to those terms.  Accordingly, as the Court held on summary judgment, the contractual terms "enterprise value" and "equity value" are genuinely ambiguous, at least as applied to the earnouts dispute in this case.  *See Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 178 (2d Cir. 2004) ("Ambiguity in a contract is the inadequacy of the

---

[14] The Court observes what is perhaps an obvious point: that some of the only documents admitted at trial that actually use the term "purchase price" in connection with the Mineral Fusion and Andalou Naturals transactions are their respective purchase agreements, both of which define the terms "purchase price," "aggregate purchase price," and/or "equity purchase price" as exclusive of earnouts.  *See* Joint Ex. 9 at 1-2; Joint Ex. 12 at 16.

[15] Although the Court concludes on the facts before it that both parties' positions are commercially reasonable, it recognizes that there may be other reasonable definitions of "equity value" under which earnouts are included as part of a company's equity value only to the extent those earnouts are actually earned.  *See, e.g.*, *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc'y*, 769 F.3d 807, 810 n.1 (2d Cir. 2014) ("An earnout permits parties to conclude a merger without first agreeing as to the proper valuation of the target company . . . '[t]hrough a contingent payment structure, the parties agree to disagree and defer the ultimate valuation question until a later point in time when the uncertainties with respect to valuation have been resolved.'" (emphasis added) (quoting B.J.M Quinn, *Putting Your Money Where Your Mouth Is: The Performance of Earnouts in Corporate Acquisitions*, 81 U. Cin. L. Rev. 127, 133 (2012))).  Waterloo did not, however, advance this interpretation at any point in this litigation: rather, its position has always been that the entire potential earnout amount is included in "enterprise value," and even after trial, it explicitly declined to adopt the position "that earnouts 'count' if and only to the extent they are earned and paid."  Waterloo F&C Rebuttal at 4.  While one of Fabregas' emails appeared to state that the earnouts might count as "equity value" only to the extent they were earned, Fabregas disavowed this email as a "mistake."  Trial Tr. at 102:25.  Thus, to the extent the parties' post-trial submissions entertain the alternative interpretation that the Mineral Fusion and Andalou Naturals earnouts are properly included in the contract's definition of "equity value" only to the extent those earnouts were actually earned, the Court declines to consider a new interpretation presented for the first time only after trial, and regarding which no evidence was elicited.

wording to classify or characterize something that has potential significance.  A contract may be ambiguous when applied to one set of facts but not another.").

Despite the clear need to resolve this ambiguity, neither party called an expert to testify to the meaning of "enterprise value" as applied to the facts of this case, or introduced evidence about any "habitual or customary practice of the" relevant "industry" that the May 2017 contract might have incorporated, *Flower City Painting Contractors, Inc. v. Gumina Const. Co.*, 591 F.2d 162, 165 (2d Cir. 1979).  Thus, despite Waterloo's position that the contract is unambiguous and Fabregas' corroborating assertion that his understanding of "enterprise value" is "standard in finance," Trial Tr. at 32:14, there is no independent evidence in the record as to whether the standard in finance is, in fact, that earnouts are included, either in whole or in part, in "enterprise value" when considering acquisitions of this type. *Cf. Maverick*, 595 F.3d at 466 (explaining that contractual terms are not ambiguous if they are subject to only one meaning when viewed by a person "who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business").  The Court is therefore left to consider extrinsic evidence of the parties' actions, statements, and course of conduct to determine their intent.

As previously noted, there is no evidence of the parties' intent during or before the execution of the May contract, as the parties did not discuss either the meaning of "enterprise value" or "equity value" or the relevance of earnouts to those terms.  Indeed, Fabregas indicated that he did not have an understanding as to what form BWX's acquisitions might take when he signed the April contract, suggesting that he did not contemplate the possibility of earnouts when he signed the May contract.  Accordingly, the Court considers whether any post-execution conduct by the parties reveals their intent as to whether or how these earnouts relate to "equity value." *See Stone Key Partners*, 333 F. Supp. 3d at 325 (explaining that outward manifestations of a particular

interpretation after a contract is formed but before its meaning is disputed is entitled to "great . . . weight").

The record indicates that, at multiple points after signing the May contract but before the instant dispute arose, Waterloo's actions communicated to BWX an intent that the Mineral Fusion and Andalou Naturals earnouts were *not* part of their respective enterprise values. Most saliently, Fabregas repeatedly admitted that he was aware of the existence and content of the earnout provisions in the Mineral Fusion purchase agreement before he submitted invoices that did not account for the earnouts when calculating either company's "enterprise value. Trial Tr. at 92:1-4, 95:22-96:14. This admission is supported by the fact that Fabregas replied to an email thread that specifically mentioned the earnout provisions. *See* Joint Ex. 7. Moreover, Finlay replied to Fabregas' message, suggesting that BWX was aware of Fabregas' knowledge of the earnouts prior to Waterloo submitting its invoices—and thus implicitly agreed with the expressed interpretation that the earnouts were not relevant to calculating equity value. The Court finds this to be compelling evidence that, early in the life of the contract but before any dispute arose, Waterloo communicated an intention that "enterprise value" did not include known earnouts.[16]

Fabregas explained during cross-examination that some of his actions were motivated at least in part by a desire to develop a long-term relationship with BWX, as opposed to his actual belief regarding whether the earnout provisions were relevant to "enterprise value"—in other words, that his subjective intent was that the earnouts were indeed part of "enterprise value." He also explained that some of his statements may have been the product of confusion regarding discrepancies between BWX's purchase agreements and press releases. The Court has no reason

---

[16] Other communications from Waterloo to BWX during the time period before any dispute arose appear to express the interpretation that the earnouts could or should be included in enterprise value only if they are actually earned. *See* Joint Ex. 18. At trial, however, Fabregas disavowed this position, testifying that he had made a "mistake" when he had expressed that understanding in his email. Trial Tr. at 102:25.

to doubt the sincerity of Fabregas' beliefs or his confusion—in fact, it shares some of that confusion. But his "uncommunicated subjective intent cannot supply the ultimate meaning" of the contract, particularly given the contradictory expressions of intent that he communicated to BWX. *SR Int'l*, 467 F.3d at 125; *accord Mencher v. Weiss*, 114 N.E.2d 177, 181 (N.Y. 1953) ("[T]he manifestation of a party's intention rather than the actual or real intention is ordinarily controlling.").[17]

Other expressions of Waterloo's intent shortly after the contract's execution further communicated to BWX that Waterloo did not understand the earnouts to be part of "equity value." After submitting multiple invoices that did not include Mineral Fusion's and Andalou Naturals' earnouts as part of their enterprise values, Fabregas then sent an email to BWX in which he appeared to change course—but by asserting that earnouts constituted "net financial debt." *See* Joint Exs. 19, 20. Indeed, from the beginning of its case to as late as the first day of trial, Waterloo appeared to argue that the earnouts were relevant only to the term "net financial debt." *See, e.g.*, Verified Complaint ¶¶ 165, 240; Fabregas Dep. at 72:8-13 ("[Y]ou have to understand, which I think is at the heart of this issue, what really net financial debt is."); Thompson Dec. in Support of Waterloo's Motion for Summary Judgment ¶ 14 ("[D]eferred compensation qualifies as financial debt."); Trial Tr. at 119:9 (Fabregas stating that "the earnout to the buyer is net financial debt"). But such evidence and arguments cannot support Waterloo's position that the earnouts fall under

---

[17] The Court does note, however, that certain aspects of Fabregas' explanation for his invoice numbers are not entirely consistent with his "confusion" explanation. Namely, Fabregas testified that he had been confused by discrepancies between the Mineral Fusion press release and the Mineral Fusion purchase agreement, and that he therefore "took the numbers from the press release" for his invoice. Trial Tr. at 96:5-9. But his invoice lists the Mineral Fusion enterprise value at $42.2 million, a number that appears nowhere in that press release. *See* Joint Ex. 10 at 1. The only document that lists a $42.2 million figure is the Mineral Fusion purchase agreement, which states that the company's "aggregate purchase price" was $42.2 million—a figure that explicitly does not include the earnouts, which are discussed in an entirely separate section of the agreement.

"equity value," which is a separate component of the "enterprise value" formula.[18]  Taken together, these self-contradictory statements over time regarding Waterloo's intent make it difficult for the Court to conclude that, when Waterloo signed the May 2017 contract, it had the intent that the entire potential amount of earnouts would be included in the "equity value" of a company for purposes of calculating Waterloo's success fee.[19]

By contrast, the evidence that best supports Waterloo's position is: (1) BWX's financial reports that provided that the "provisional fair value" of the consideration transferred in connection with the Mineral Fusion and Andalou Naturals transactions included the full potential amounts of the earnouts; and (2) the PwC report stating that the "enterprise values" of the two companies were equivalent to their "equity values," and that those "enterprise values" consisted of the funds actually transferred at closing *plus* the full potential amount of the earnouts.  Waterloo relies on these documents as conclusive evidence that BWX understood that the full potential amount of the earnouts was part of each acquired company's "enterprise value" for purposes of the May 2017 contract.  Thus, according to Waterloo, the enterprise value for Mineral Fusion is roughly $48.6 million in U.S. dollars and the enterprise value for Andalou Naturals is roughly $92.8 million in U.S. dollars—the aggregate of which exceeds $130 million.

---

[18] Waterloo's post-trial submission attempts to render the statements Fabregas made at trial with consistent with Waterloo's "equity-value" position.  *See* Plaintiff Waterloo Capital Partners, LLC's Response to Defendant BWX Limited's Post-Trial Facts and Conclusions of Law ("Waterloo F&C Rebuttal") at 9 n.8 ("[A]s Mr. Fabregas explained to the Court at trial, his primary point about 'financial debt' was as a way to show that the earnouts were simply a form of seller financing, like a home buyer taking out a mortgage.  To BWX, the earnout was [a] form of debt, but to the sellers (here, Mineral Fusion and Andalou), the earnouts were simply a form of consideration for their equity.").  But this explanation does not reconcile the assertions made months and years before trial with Waterloo's position at trial.

[19] Neither party argues now that the earnouts should be considered "net financial debt."  Even if the Court were to entertain such an interpretation, it would reject it as contrary to the plain language of the contract.  *See* Joint Ex. 6 at 4 (defining "net financial debt" as "net financial debt *of the success fee company*") (emphasis added).

BWX insists that it made the "provisional fair value" estimates in its financial reports solely to comply with accounting standards, and that its statements in compliance with those standards are largely irrelevant to the meaning of "equity value" as that term is used in the May 2017 contract. *See* BWX F&C ¶ 70 (asserting that the reports were "prepared not as valuations but only as required to meet the standards for financial statement reporting"). In the Court's view, these reports are by no means irrelevant, as they appear to show that in the periods immediately after Mineral Fusion's and Andalou Naturals' acquisitions, BWX believed that the full potential amount of the earnouts would be paid. But, for several reasons, the Court does not see the statements in these reports as determinative of BWX's intent with respect to the May 2017 contract. First, the terms "equity value" and "enterprise value" appear nowhere in the financial statements in connection with these figures; nor is the May 2017 contract with Waterloo ever mentioned in the financial statements. This makes it difficult to equate BWX's statements about "provisional fair value" with its contractual promise regarding "equity value," particularly given the different contexts in which the May 2017 contract and the financial statements arose, as well as the potential impact of the accounting standards on BWX's statements. To be sure, it could be argued that BWX's estimate of the "provisional fair value" of the "consideration transferred" should be treated as synonymous with a statement about "equity value"—an assertion that an expert may well have made. But the Court is unwilling to make that definitional leap on its own. Second, the report makes clear that BWX's fair-value estimates regarding the consideration transferred are "provisional" and subject to re-evaluation. Joint Ex. 30 at 54; Joint Ex. 31 at 18. The Court is hesitant to conclude that BWX intended for "provisional" value estimates to conclusively determine the amount of money it owed another party under a contract, particularly when BWX explicitly stated at the time of its fair-value estimation that these estimates might require future

adjustments.[20]  In effect, Waterloo would have the Court bind BWX to provisional estimations made in its financial reports, but disregard the language explaining and contextualizing those provisional estimations.  The Court is not prepared to do so—just as it was not prepared to do on summary judgment, when it declined to rule for Waterloo on the basis of these same reports.

The PwC report appears to use the same numerical values that BWX's financial reports use when stating the "estimated fair value" of the consideration transferred in connection with the Mineral Fusion and Andalou Naturals acquisitions.  But, unlike the financial reports, the PwC report uses the term "enterprise value" to describe those figures, and also equates "enterprise value" to "equity value" for both companies.  *See* Joint Ex. 24 at 13, 77, 90.  Moreover, as the Court previously ruled, PwC's statements are attributable to BWX.  *See* Trial Tr. at 225:16-227:20.  This suggests that BWX, at the very least, adopted a statement made in July 2018 that the "equity value" of the acquired companies included the full potential amount of the earnouts associated with their acquisitions—and thus weighs in Waterloo's favor.

Nonetheless, when the evidence of the parties' intent is viewed as a whole, it remains sparse, conflicting, and inconclusive.  On the one hand, Fabregas' invoices issued shortly after the contract suggests that Waterloo did not intend earnouts to count as part of the acquired companies' equity value, and BWX's performance of the contract by paying those invoices suggests that it shared this intent.  On the other hand—and over a year after the contract and after Waterloo's relevant conduct—BWX appeared to adopt a statement that the full potential amount of the earnouts were part of the acquired companies' equity value.  Complicating matters further, there is evidence

---

[20] Indeed, one might argue that if BWX intended to unequivocally express the belief that the equity values of these companies included the full potential amount of the earnouts, it would simply have agreed to include those amounts as part of the amount transferred at acquisition, rather than as earnouts.  *Cf. Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 132 (Del. Ch. 2009) (explaining that "an earn-out . . . typically reflects . . . disagreement over the value of the business" and "solves the disagreement over value by requiring the buyer to pay more only if the business proves that it is worth more").

suggesting that at least one signatory may not have contemplated the possibility of earnouts, and thus likely had not formed *any* intent regarding whether earnouts are part of "equity value," when he signed the contract. *See* Trial Tr. at 32:18-21 (Fabregas testifying that when he signed the April contract, he did not have an understanding of the form in which BWX might structure any transactions); *HarperCollins Publishers LLC v. Open Rd. Integrated Media, LLP*, 7 F. Supp. 3d 363, 371 (S.D.N.Y. 2014) ("An inquiry into the parties' intent is not likely to be helpful when the subject of the inquiry is something the parties were not thinking about."). Indeed, the only potentially relevant evidence of the parties' intent at the time of contracting is the contract's clause that Waterloo's success fee would be "payable upon the successful completion of the transaction [*i.e.*, the acquisition of a success fee company]." Joint Ex. 6 at 3. Waterloo argues that this language shows that "the parties knew that the equity value [of the acquired companies] was determinable at acquisition date." Plaintiff Waterloo Capital Partners, LLC's Post-Trial Proposed Findings of Fact and Conclusions of Law ("Waterloo F&C") ¶ 54. But even accepting this premise, a shared assumption that equity value would be determinable on acquisition date can lead to multiple different conclusions: that the equity value includes the full value of the potential earnouts; that the equity value includes only the funds that actually changed hands on the acquisition date; or (as the Court suspects might be the case) that neither party anticipated that the presence of earnouts in an acquisition might complicate the determination of equity value at acquisition date.[21]

In sum, although the Court finds this to be an extremely close question, it concludes that Waterloo has ultimately failed to meet its burden of establishing by a preponderance of the evidence that the parties' intent was to include the Mineral Fusion and Andalou Naturals earnouts

---

[21] To be clear, BWX does not argue that the May 2017 contract—or at least the provision of that contract regarding Waterloo's "additional success fee"—is void because no meeting of the minds occurred with respect to earnouts' role in determining equity value or because the term "equity value" is fatally indefinite as applied to earnouts. Accordingly, the Court does not consider any such arguments.

in the calculation of "equity value."  Critically, Fabregas repeatedly made statements to BWX indicating that the earnouts were *not* part of equity value, both when he submitted an invoice that did not account for those earnouts despite his demonstrated knowledge of at least some of those earnouts and when he later asserted that the earnouts were "net financial debt."  Moreover, BWX's payment of Waterloo's invoice appeared to manifest its agreement with an understanding of "equity value" that did not include earnouts.  This evidence of "course of performance," *Hoyt*, 433 F.3d at 332, and of "the practical interpretation of a contract by the parties to it for [a] considerable period of time before it comes to be the subject of controversy," is "deemed of great, if not controlling, influence," *IBJ Schroder Bank & Tr. Co. v. Resolution Tr. Co.*, 26 F.3d 370, 374 (2d Cir. 1994).  By contrast, although it is true that BWX management either stated or adopted the statement that the "estimated fair value" of the companies' "equity value" included the entire potential amount of their earnouts, it did so well after the execution of the May 2017 contract and BWX's payment of Waterloo's base success fee under that contract; in a context entirely separate from the contract; and after the dispute regarding the meaning of the contract had already arisen. In other words, while the evidence of Waterloo's intent consists of Waterloo's "course of conduct *under* [the] contract," the evidence of BWX's subsequent course of conduct is more attenuated from the contract. *CP III Rincon Towers, LLC v. Cohen*, No. 10-CV-4638 (JMF), 2022 WL 61318, at *8 (S.D.N.Y. Jan. 6, 2022) (emphasis added).  Further limiting the PwC report's probative value is the fact that Waterloo never developed this aspect of the report at trial: although Finnis adequately laid a foundation for the report generally, he did not mention the report's use of the terms "enterprise value" or "equity value."  For these reasons, the Court is not assured that the statements in the PwC report conclusively divine BWX's intent when Finlay signed the contract, particularly in light of the prior conflicting evidence of Waterloo's intent.

Given the totality of the evidence presented at trial, the Court is not able to conclude that Waterloo has demonstrated that the parties shared its proposed interpretation of "equity value" with respect to the May 2017 contract.  Waterloo has thus not met its burden.  *See Canada Life Assur. Co. v. Guardian Life Ins. Co. of Am.*, 242 F. Supp. 2d 344, 358 (S.D.N.Y. 2003) ("It is well settled that if two parties give different meanings to words of a purported agreement, the party who sues for enforcement in accordance with his own meaning has the burden to demonstrate that the other party knew what the claimant's meaning was.").  Even treating the evidence in the light most favorable to Waterloo by concluding that it is equally probative in both directions, that means only that Waterloo has established that the evidence of the parties' intent is evenly balanced, which falls short of proving by a preponderance of the evidence that the parties' contractual intent aligned with Waterloo's proposed interpretation.  *See Kosakow v. New Rochelle Radiology Assocs. P.C.*, 274 F.3d 706, 731 (2d Cir. 2001) ("[W]here the burden of proof is a preponderance of the evidence, the party with the burden of proof would lose in the event that the evidence is evenly balanced."); *Reddy v. Commodity Futures Trading Comm'n*, 191 F.3d 109, 118 (2d Cir. 1999) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses."); *see also Veltman v. Norton Simon, Inc.*, 425 F. Supp. 774, 774 (S.D.N.Y. 1977) (holding for a defendant after a bench trial on a breach of contract claim after finding that "[t]he plaintiffs failed to sustain the burden of proof of a contractual intent that . . . royalties were divisible or that they were for purposes other than the use of [certain] patents either before or after their expiration").

In the absence of persuasive evidence that the parties' intent at the time of contracting was, in fact, to treat the full potential amount of earnouts as part of "equity value," the Mineral Fusion and Andalou Naturals enterprise values are limited to their purchase prices exclusive of the

earnouts.  Even if the Court were to take the highest of the various potential purchase prices for these companies that were presented at trial—roughly $44 million and roughly $82 million, respectively—that aggregate value would be $126 million, well short of the $130 million necessary to trigger the additional success fee.  Accordingly, Waterloo is not entitled to the additional success fee described in the May 2017 contract, and its breach of contract claim fails.

## III.    Attorneys' Fees

Finally, Waterloo is not entitled to the attorneys' fees it has incurred in this litigation.  In support of its argument that it is owed such fees, Waterloo points only to the signed modification to the May 2017 contract, in which "BWX agrees that it will be responsible for any and all legal costs and fees including any attorney fees incurred by WCP in enforcing payment of the Mineral Fusion Success Fee."  Joint Ex. 11.  BWX argues that this language refers solely to the $2 million that Waterloo had previously charged as the Mineral Fusion success fee, and that BWX has already paid in full.  In support of this argument, it observes that the modification "made no mention of additional amounts that might come due if Andalou [Naturals] closed successfully; nor did it allow for or address any other Success Fee payment or potential transaction in the future."  BWX Limited's Rebuttal to Plaintiff's Proposed Findings of Fact and Conclusions of Law ("BWX F&C Rebuttal") at 7-8.  The Court agrees with BWX.  The plain language of this agreement refers solely to the $2 million success fee that was incurred through the Mineral Fusion acquisition and the existence of which was known to the parties at the time of this modification; it does not describe, or even hint at, the "additional success fee" that might be incurred in the event of BWX acquiring multiple companies with an aggregate enterprise value in excess of $130 million.

## CONCLUSION

For the foregoing reasons, the Court concludes that Waterloo is not entitled to an "additional success fee" under the May 2017 contract in connection with BWX's acquisitions of Mineral Fusion and Andalou Naturals.  The Clerk of Court is respectfully directed to enter judgment for BWX and to close this case.

SO ORDERED.

Dated: June 8, 2022
New York, New York

_____
Hon. Ronnie Abrams
United States District Court Judge